**United States District Court**
**District of New Jersey**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL COMPLAINT** |
| | : | |
| **v.** | : | |
| | : | |
| YAN ZHU | : | **Magistrate No. 09-5021 (TJB)** |
| a/k/a "Wesley Zhu," | : | |
| a/k/a "Westerly Zhu" | : | |

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT "A"

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT "B"

continued on the attached pages and made a part hereof.

_William P. Hyland_
Signature of Complainant
William P. Hyland, Jr.
Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

_April 7, 2009_            at            _Trenton, New Jersey_
Date

Honorable Tonianne J. Bongiovanni
United States Magistrate Judge
Name & Title of Judicial Officer

_Signature of Judicial Officer_

**RECEIVED**

APR 7 - 2009

TONIANNE J. BONGIOVANNI
U.S. MAGISTRATE JUDGE

## ATTACHMENT "A"

### Count One

Between in or about January, 2008, and in or about February, 2009, in Mercer County, in the District of New Jersey and elsewhere, the defendant,

YAN ZHU,
a/k/a "Wesley Zhu,"
a/k/a "Westerly Zhu,"

with the intent to convert a trade secret related to and included in a product for and placed in interstate and foreign commerce, namely source code for an environmental software system developed by Company A (the "Subject Software"), and with the intent to convert said trade secret to the economic benefit of parties other than Company A, and intending or knowing that their actions would injure Company A, did knowingly and wilfully conspire and agree with others to steal said trade secret, and did take an act to further the object of the conspiracy, namely, on or about May 5, 2008, defendant ZHU did transmit source code for the Subject Software from his Company A e-mail account to his personal e-mail account, contrary to Title 18, United States Code, Section 1832(a)(1), and in violation of Title 18, United States Code, Section 1832(a)(5).

### Counts Two through Nine

On or about the dates set forth below, in Mercer County, in the District of New Jersey and elsewhere, the defendant,

YAN ZHU,
a/k/a "Wesley Zhu,"
a/k/a "Westerly Zhu,"

having knowingly and wilfully devised and intended to devise: (1) a scheme and artifice to defraud Company A by obtaining money and property from Company A, namely, the Subject Software, source codes for the Subject Software, and proprietary and confidential information related to the Subject Software; and (2) a scheme and artifice to defraud Company A of its intangible right to defendant ZHU's honest services as an employee of Company A, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds, as set forth below:

| Count | Date | Interstate Wire Communication |
|:-----:|:-----|:------------------------------|
| 2 | 3/12/08 | E-mail containing complete database document for the Subject Software. |
| 3 | 3/18/08 | E-mail containing waste profile design database schema for the Subject Software. |
| 4 | 3/19/08 | E-mail containing screen design and detailed programming guides for the Subject Software. |
| 5 | 3/19/08 | E-mail containing user guides for the Subject Software. |
| 6 | 3/28/08 | E-mail containing demonstration document for the Subject Software. |
| 7 | 5/2/08 | E-mail containing source codes for the Subject Software. |
| 8 | 5/5/08 | E-mail containing source codes for the Subject Software. |
| 9 | 5/5/08 | E-mail containing source codes for the Subject Software. |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## ATTACHMENT "B"

I, William P. Hyland, Jr., am a Special Agent with the Federal Bureau of Investigation. I have knowledge of the following facts from my own investigation, my review of pertinent documents, and my discussions with and review of reports, translations, and other documents prepared by other law enforcement officers and translators involved in the investigation. Because this Affidavit is submitted for the sole purpose of establishing probable cause to support the issuance of a Criminal Complaint, I have not included each and every fact known to me concerning this investigation. All conversations are recounted in sum and substance, unless indicated otherwise.

### The Victim.

1. Company A is a software and consulting company, with its principal office in Mercer County, New Jersey. Company A's core business consists of the development, support, and implementation of computer systems and software for environmental applications.

2. One of Company A's products is a comprehensive multi-media environmental information management portal. This product is made up of various components, or, in Company A's nomenclature, "systems." Company A developed one particular system for the Chinese market (the "Subject Software"). The Subject Software is a proprietary software program that allows the user to manage air emissions, ambient water quality, and ground water quality. The Subject Software was, in turn, made up of four "modules." These modules have been described as follows: a pollution source information and permitting module; a manifest module, which allows the user to track a chain of custody during hazardous waste disposal; a report-generating module; and a geographic information system, or mapping, module.

3. Company A considers the Subject Software and its source code to be proprietary information. Company A therefore takes steps to protect the Subject Software and its source code. Specifically, Company A does not sell the source codes to its customers, nor does it release the source codes outside of the company. Instead, purchasers of the Subject Software receive only the software that makes up the Subject Software. When Company A sells its software, it uses an encryption technique to protect its source codes. Even within Company A, the company takes steps to protect the Subject Software source codes. Specifically, the source codes reside on an Company A computer server where only employees with a particular security access, as determined by Company A, can access it.

4. According to Company A, the source codes for the Subject Software have commercial value independent of the Subject Software itself. First, according to Company A, the source codes are needed to make modifications and upgrades to the software. Therefore, ownership of the source codes controls future revenues to be derived from software sales. Second, if a party outside of Company A comes into possession of the source codes, that party can install, run, and sell the software itself. Company A would therefore lose revenues from future sales of the software. In addition, the party that came into possession of the source codes could profit by selling the software, without incurring the substantial research and development costs that Company A incurred to develop the software.

**The Defendant.**

5. The defendant, YAN ZHU, a/k/a "Wesley," a/k/a "Westerly," is a citizen of the People's Republic of China ("China") who is currently in the United States on a work visa. In or

about 2006, defendant ZHU received a Ph.D. in geo-environmental engineering from Columbia University, in New York, NY. In approximately April 2006, Company A hired defendant ZHU as a Senior Environmental Engineer. Defendant ZHU ultimately became the lead project engineer on the Subject Software project. On or about July 17, 2008, Company A terminated defendant ZHU's employment.

6. On or about May 1, 2006, defendant ZHU signed an Employment, Confidentiality, and Non-Disclosure Agreement with Company A. Pursuant to this agreement, defendant ZHU promised not to disclose any Company A confidential information, which specifically included Company A computer programs and software, and to return any confidential information to Company A if he separated from the company. On or about July 18, 2008, in connection with his termination from Company A, defendant ZHU signed a document in which he agreed to return all confidential information to Company A, including product source codes. Defendant ZHU further advised that he had not provided Company A product source codes to anyone, and that no copies of Company A confidential information, including, without limitation, copies of Company A source codes, power points, design documents, or system guides, were in his possession.

**Certain Co-Conspirators.**

7. Co-Conspirator #1 ("CC-1") is a Chinese national residing in China. CC-1 is believed to have previously served in an appointed position controlled by the Communist Party of China. In approximately November 2006, Company A, based upon an introduction by defendant ZHU, hired CC-1 to serve as Company A's sales representative in China. In

-3-

approximately August 2007, Company A rented office space for CC-1 in the Science and Technology High-Tech Zone in Xian City, Shanxi Province, China.

8. Co-Conspirator #2 ("CC-2") is an individual, believed to be a Chinese national residing in China, who is an associate of defendant ZHU and CC-1. CC-2, along with defendant ZHU, CC-1, and others, are all associated with Company X, an environmental software company in Xian, China.

**The Shanxi EPA Contract.**

9. On or about July 25, 2007, Company A signed a contract with Shanxi Province, China, to provide the province's Environmental Protection Administration ("Shanxi EPA") with the Subject Software. CC-1 acted as Company A's sales representative on this contract. The contract had a total price of approximately 11.5 million Chinese Yuan Renminbi ("Yuan"), or approximately $1.5 million at then-prevalent currency exchange rates. Company A was to deliver the Subject Software in four modules. Shanxi EPA was to pay 25% of the contract price within ten days of signing the contract, 30% upon the delivery of module 1, 35% upon delivery of modules 2 and 3, and 10% upon delivery of module 4. Shanxi EPA did not, however, make the initial 25% payment in a timely fashion.

10. Nonetheless, on or about October 26, 2007, Company A delivered the first module of the Subject Software to Shanxi EPA. An acceptance presentation was held at the office space Company A rented for CC-1 in Xian. A principal of Company A (hereinafter the "Company A Principal"), defendant ZHU, and a third Company A employee traveled to Xian to attend the presentation. Also, because Shanxi EPA did not have a computer server to host the system, the

-4-

system was temporarily installed and hosted at the office space that Company A rented for CC-1 in Xian City.

11.  On or about November 9, 2007, Shanxi EPA made the first payment of 3 million Yuan to Company A.  CC-1 told the Company A Principal that, according to Shanxi officials, Shanxi Province could not make payment overseas.  Company A therefore authorized CC-1's company, Company X, to accept payment on behalf of Company A.  CC-1 and Company A agreed that, after receipt by Company X, this payment would be split between CC-1's personal account, to pay fees owed to CC-1, and a personal account maintained by the sister of the Company A Principal.  The Company A Principal's sister was in China to oversee CC-1 and the office that Company A rented in Xian City.  The parties further agreed to hold a sum of money in reserve to pay taxes.

12.  On or about December 10, 2007, Company A paid defendant ZHU a bonus of 52,314 Yuan for his work on the Subject Software.  At defendant ZHU's request, Company A wire transferred this bonus to CC-1's personal bank account in Xian City.

13.  In or about March, 2008, Company A notified Shanxi Province that Company A had completed development of all four modules of the Subject Software.  However, Shanxi Province never made any additional payments to Company A beyond the initial 3 million Yuan payment, so Company A never delivered any further modules.

**The Hebei EPA Lead.**

14.  On or about November 21, 2007, a visiting delegation from the China State EPA ("SEPA") came to Company A's offices.  On or about November 29, 2007, the Company A

Principal e-mailed CC-1 contact information for certain representatives of the Hebei Province, China, EPA ("Hebei EPA"), who had expressed an interest in the Subject Software.

15. On or about January 27, 2008, a SEPA official from the delegation that visited Company A sent the Company A Principal an e-mail. The SEPA official stated that the official had visited Hebei Province and spoken to Hebei EPA officials, who indicated that they were interested in Company A's Subject Software.

**Defendant ZHU and Others Steal the Subject Software.**

16. Investigation has revealed that as early as on or about January 31, 2008, defendant ZHU, CC-1, CC-2, and another individual believed to be associated with Company X were exchanging e-mails about unspecified business meetings.

17. Investigation has further revealed that, in March 2008, defendant ZHU sent a series of e-mails containing confidential and proprietary information pertaining to the Subject Software. Specifically, on or about March 12, 2008, defendant ZHU e-mailed, from his Company A e-mail account to his personal e-mail account, a 93-page document dated August 3, 2007. The cover page bears the Company A logo and company address, and is marked "Internal Use Only" in bold-faced type. This document is the complete database document for the Subject Software modules 1, 2, 3, and 4. On or about March 18, 2008, defendant ZHU sent an e-mail, from his Company A e-mail account to CC-2's personal e-mail account, attaching a document bearing the Company A company name and a revised date of May 8, 2007. According to Company A, the attachment includes the Subject Software waste profile database design schema, which are used to calculate waste profiles and quantities for specific industrial manufacturing processes. Then,

-6-

on or about March 19, 2008, defendant ZHU e-mailed, from his Company A e-mail account to CC-2's personal e-mail account, attachments providing: (1) screen design and detailed programming guides for the Subject Software; and (2) user guides for the Subject Software. On or about March 28, 2008, defendant ZHU sent, from his Company A e-mail to his personal e-mail account, a demonstration document used in marketing, product demonstration, and sale of the software.

18. On or about May 21, 2008, the sister of the Company A Principal sent the Company A Principal an e-mail alleging that CC-1 had misappropriated money. Specifically, the sister of the Company A Principal alleged that CC-1 had taken a portion of the money, taken from Shanxi EPA's 3 million Yuan initial payment to Company A, that CC-1 and Company A had agreed to keep in reserve to pay taxes.

19. In light of this allegation, in or about late May or early June, 2008, Company A began reviewing and monitoring defendant ZHU's and CC-1's Company A e-mail accounts. Company A's review of these e-mails revealed that in May, 2008, defendant ZHU sent three e-mails from his Company A e-mail account, to his personal e-mail account, containing proprietary source codes for the Subject Software. Specifically, on or about May 2, 2008, defendant ZHU sent an e-mail that included, in the body of the e-mail, source codes for the Subject Software. Then, on or about May 5, 2008, defendant ZHU sent two e-mails, both containing attachments. The first e-mail attachment contained approximately 281 pages of Subject Software source codes. The second e-mail attachment contained approximately 2077 pages of Subject Software source codes.

20. On or about July 1, 2008, defendant ZHU sent an e-mail from his personal e-mail account to CC-1, CC-2, and another individual believed to be associated with Company X. The subject line of the message was "RE: logo," and a potential logo for Company X was attached to the e-mail. The e-mail was sent in response to an e-mail that CC-2 had sent to defendant ZHU on July 1, 2008, that also bore the subject line "RE: logo."

21. On or about July 16, 2008, the Company A Principal's sister reported that CC-1 had changed the locks on the office space that Company A rented in Xian City, China. The sister of the Company A Principal then met with Shanxi EPA's project manager concerning the Subject Software project, and told the project manager that CC-1 no longer represented Company A on the project.

22. On or about July 17, 2008, Company A terminated defendant ZHU's employment. In a letter dated July 16, 2008, Company A's attorney advised defendant ZHU that he breached his May 1, 2006 Employment, Confidentiality, and Non-Disclosure Agreement by e-mailing the Subject Software source codes to his personal e-mail account. This letter concluded that defendant ZHU had misappropriated Company A's confidential information, and reminded defendant ZHU of his obligation, under the May 1, 2006 agreement, to return any Company A proprietary information, including the Subject Software source codes, to the company.

23. During his exit interview, defendant ZHU was confronted about the May, 2008, e-mails he sent to his personal e-mail account containing the Subject Software source codes. Defendant ZHU admitted that he sent the Subject Software source codes to his personal e-mail account, but denied having sent the source codes to CC-1. Instead, defendant ZHU stated that he

-8-

had e-mailed the source codes to himself so that he could run the program from home. However, defendant ZHU admitted that CC-1 had asked defendant ZHU for the source codes many times.

24. On or about July 18, 2008, defendant ZHU signed a notarized affidavit acknowledging that he had reviewed the July 16, 2008, letter from Company A's attorney concerning the Subject Software source codes. In this notarized affidavit, defendant ZHU agreed that he would return all confidential information, including source codes, to Company A. Defendant ZHU further agreed that he had not provided Company A product source codes to anyone, and had no copies of Company A confidential information in his possession.

25. On or about October 30, 2008, Company A confirmed in writing to Shanxi EPA's Subject Software project manager that CC-1 no longer represented Company A in China.

26. On or about November 10, 2008, Company A found a link on Shanxi Province's Internet web site to a program described as a multi-media environmental system, a description similar to that used to describe the Subject Software. Following this link, Company A discovered that the software consisted of an operational version of module 1 the Subject Software. Company A noticed that module 1 was changed from the version Company A had previously supplied to Shanxi Province. According to Company A, these changes could not have been made without the Subject Software source codes. Company A was able to enter the software system using an administrative user name and password that Company A had built into the Subject Software. Company A employees were then called into a meeting, where they were shown the software on the Shanxi Province web site. These employees recognized software based on codes they had written.

-9-

27. One aspect of the software that had been changed was the contact information for the supplier of the software. The Company A Subject Software lists Company A – with its address, telephone, number, and e-mail address – as the supplier. The program running on Shanxi Province's web site listed contact information for Company X. This information consisted of the address in Xian, China, that Company A had rented for CC-1, a Chinese telephone and fax number, and an e-mail address.

28. On or about November 16, 2008, Company A went back to the Shanxi Province web site. At that time, Company A observed that the program was still on the web site, but the Company A administrative user name and password no longer provided access to the system. According to Company A, the Subject Software source codes would be needed to change the software and deny system access using the administrative user name and password.

29. On or about November 17, 2008, Company A personnel discovered information on the Shanxi Province Software Industry Association's web site reflecting that Company X had registered software for a pollution information management system. This pollution information management system was described on the website in terms substantially similar to those used to describe the Subject Software.

30. On or about October 27, 2008, Hebei EPA made a public announcement that it had entered into an agreement to purchase software from Company X, CC-1's company in China. The software product is described in terms comparable to those used to describe the Subject Software. In or about November, 2007, the Company A Principal had provided CC-1 with Hebei EPA's contact information, and in or about January, 2008, the SEPA representative told the Company A Principal that Hebei EPA was interested in purchasing the Subject Software from

-10-

Company A. Hebei EPA's announcement stated that it had agreed to pay Company X 1,090,000 Yuan for the software, approximately one-tenth of what Company A had sought for the Subject Software.

31. Defendant ZHU and his co-conspirators have continued to market and distribute the Subject Software to various government entities in China. The Shanxi Province website reveals that, on or about February 9, 2009, defendant ZHU and CC-1 conducted a presentation to Shanxi and other provincial environmental officials regarding the Subject Software. A link on the Shanxi Province website includes photographs of defendant ZHU and CC-1 with individuals identified as Chinese environmental officials.

32. Finally, certain e-mail communications from defendant ZHU reflect an awareness that his conduct in transferring source code and other proprietary and confidential documents pertaining to the Subject Software to CC-1, CC-2, and others in China was not appropriate. In an e-mail sent on or about March 19, 2008, defendant ZHU explained to CC-2 that an earlier e-mail had been sent to defendant ZHU's Company A e-mail account. Defendant ZHU told CC-2 to take notice of which account CC-2 was using for defendant ZHU, and suggested that future communications should be routed to his personal e-mail account rather than his Company A account. On or about July 17, 2008, defendant ZHU sent an email from a new personal e-mail account, notifying CC-1, CC-2, and another individual that they should now use this new e-mail address for future communications. As noted above, this was the very same day that Company A terminated ZHU's employment. It was also the same day that defendant ZHU created this new personal e-mail account. The timing of the creation of the new personal e-mail account, and the e-mail to his co-conspirators announcing the same, indicate an effort on defendant ZHU's part to

-11-

conceal his activities, since, during his exit interview at Company A, defendant ZHU had been confronted with the May, 2008, e-mails he sent to his prior personal e-mail account containing the Subject Software source codes.