# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Criminal No. 09-00722 (JAP) |
| v. | : | **OPINION** |
| YAN ZHU, | : | |
| Defendant. | : | |

PISANO, District Judge.

On January 6, 2011, the Grand Jury for the District of New Jersey entered a superseding indictment in this criminal case, charging Defendant Yan Zhu with one count of conspiracy to steal trade secrets, two counts of theft of trade secrets, and seven counts of wire fraud. A jury trial was held in from March 14, 2011 to March 31, 2011. On April 6, 2011, the jury returned a verdict of not-guilty of conspiracy to steal trade secrets, not-guilty of theft of trade secrets, and guilty of wire fraud. The Defendant moved to set aside the guilty verdict pursuant to Federal Rule of Criminal Procedure 29(c), and for a new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons set forth in the Opinion filed on August 4, 2011, the Defendant's motions were denied. The Defendant moved for Reconsideration of the Court's denial of his post-trial motions. For the reasons set forth in the Opinion filed on November 3, 2011, this Motion was denied. On January 5, 2012, the Court sentenced Yan Zhu to three years of probation with special conditions. This Opinion is intended to supplement the record of that date, and shall constitute the Court's findings and conclusions with regard to Zhu's sentencing.

I.  **FACTUAL BACKGROUND** [1]

The Defendant was employed as a senior engineer at enfoTech, Inc., a company that develops and supports environmental software primarily for governmental entities ("enfoTech" or the "Company").  In connection with his employment at enfoTech, the Defendant signed a confidentiality agreement, which prohibited the unauthorized disclosure of enfoTech's confidential business information.  During his employment at enfoTech, the Defendant reported directly to Tony Jeng, a co-owner of the Company.

In August of 2006, the Defendant introduced Jeng to his cousin-in-law, Wanqi Tang, who had access to government officials in the Shaanxi Province in China.  Pursuant to a cooperation agreement between Jeng and Tang, Tang formed a company in China called Green Innovation Technology ("Green Innovation"), which was to be the Chinese counterpart to enfoTech.  In 2007, the Company entered into a contract with the Shaanxi Province in China to develop a software program called eWastePro.  The Defendant ultimately became the project manager for eWastePro.  Tang asked enfoTech for 800,000 Yen in "special marketing expenses" in connection with the Shaanxi Province contract.  The Company agreed to this request and allocated that amount to Tang out of the first payment made by the Shaanxi Province in November of 2007.

In October of 2007, the Defendant, Jeng and other enfoTech employees traveled to China to demonstrate the eWastePro software program to Shaanxi Province officials.  The parties submitted conflicting evidence at trial as to the functionality of the eWastePro software program at that time.  The parties also presented conflicting evidence about how much work was done on

---

[1] A brief synopsis of the factual background is provided here; greater detail, along with specific citations to the record, may be found in this Court's Opinion accompanying its denial of Defendant's post-trial motions on August 4, 2011.  *United States v. Yan Zhu*, No. 09-00722, 2011 WL 3422861, at *7 (D.N.J. Aug. 4, 2011).

2

eWastePro after the demonstration in China. The Defendant claimed that enfoTech misrepresented the functionality of its product at the demonstration, and subsequently had no intention of carrying out its obligation to complete the product. According to Jeng, enfoTech only stopped work on the eWastePro program in April of 2008 because the Shaanxi officials would not accept delivery of the completed product.

Towards the end of 2007 and beginning of 2008, the Defendant inquired within enfoTech about the functionality of the eWastePro program. The Defendant testified that he received unsatisfactory responses, and that thereafter he reached out to Tang to help him evaluate the functionality of the eWastePro software. Tang subsequently introduced the Defendant to He Weiqi, who was a computer technician working for Green Innovation. From January through May, 2008, Defendant emailed Weiqi many eWastepro materials, including enfoTech's deployment guide, design documents, source code, waste profile design schema, web page logics, form and user interface logics, and graphic design. It is certain of these emails that provided the basis for the wire fraud counts. Defendant made efforts to keep this correspondence on his personal email address.

Jeng became suspicious of the Defendant around April and May of 2008. As a result, the Company began to monitor the Defendant's enfoTech email account. Subsequently, Jeng became aware that the Defendant had sent emails containing confidential business information to his personal email account. In July of 2008, enfoTech terminated the Defendant for sending its proprietary information to persons outside the Company. Meanwhile, Green Innovation developed an environmental software program called eManage, which later appeared on the

Shaanxi Province website. Conflicting evidence was submitted as to the similarity of this program to eWastepro.

On January 6, 2011, Yan Zhu was charged in a ten-count superseding indictment with conspiracy to steal trade secrets, theft of trade secrets and wire fraud. On April 6, 2011, the jury returned a verdict of not-guilty on one count of conspiracy to steal trade secrets, not-guilty on two counts of theft of trade secrets, and guilty on seven counts of wire fraud. After denying Defendant's post-trial Motions, the Court sentenced him on January 5, 2012. The following shall serve as the Court's findings and conclusions with regard to this sentencing.

## II.     SENTENCING

The Sentencing Reform Act of 1984 established the United States Sentencing Commission, 28 U.S.C.A. § 991(a), which was directed to promulgate the Sentencing guidelines. 28 U.S.C.A. § 994(a)(1). The Guidelines and accompanying policy statements give effect to the purposes of sentencing outlined in 18 U.S.C. § 3553(a). *See* 28 U.S.C. § 994(a)(2). *United States v. Booker*, 543 U.S. 220 (2005), held that these Sentencing Guidelines must be advisory, rather than mandatory. After *Booker*, a sentencing court must follow a three-stage process:

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.
>
> (3) Finally, they are required to exercise their discretion by considering the relevant § 3553(a) factors, in setting the sentence they impose regardless [of] whether it varies from the sentence calculated under the Guidelines.

*United States v. Goff*, 501 F.3d 250, 254 (3d Cir. 2007) (citing *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006)). "[T]he sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale." *Rita v. United States*, 127 S. Ct. 2456, 2463 (U.S. 2007).

Judicial factfinding by preponderance of the evidence is permitted in sentencing, provided that the guidelines are applied in an advisory manner, and that the sentence imposed is reasonable and within the statutory range. *United States v. Grier*, 475 F.3d 556 (3d Cir. 2007); *United States v. Fisher*, 502 F.3d 293, 305 (3d Cir. 2007) (citing *Grier*, 475 F.3d at Id. at 568-71; *Rita*, 127 S. Ct. at 2462). The government bears the burden to prove the facts triggering a sentence enhancement by a preponderance of the evidence. *United States v. Napier*, 273 F.3d 276, 279 (3d Cir. 2001) (citing *United States v. Evans*, 155 F.3d 245, 253 (3d Cir. 1998)); *United States v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008).

A reviewing court should presume that a within-guidelines sentence is reasonable, but the sentencing court is entitled to no such presumption. *Rita*, 127 S. Ct. at 2465 (citing *Booker*, 543 U.S. at 259-60).

> Although the District Court is not required either to comment on every argument counsel advances or to make findings as to each § 3553(a) factor, it nevertheless should expressly deal with arguments emphasized by the parties, and "the record [must] make[] clear the court took the [§ 3553(a)] factors into account in sentencing."

*Goff*, 501 F.3d at 255 (citing *United States v. Cooper,* 437 F.3d 324, 329 (3d Cir. 2006)).

### A. The Guideline Range

Pursuant to U.S.S.G. § 2B1.1, the base offense level for Yan Zhu's fraud conviction is seven. The Government argues that three Guideline enhancements apply: (1) a fourteen-level

5

increase for a loss between $400,000 and $1,000,000 pursuant to U.S.S.G. § 2B1.1(b)(1)(H); (2) a two-level increase for an offense committed substantially from outside the United States and otherwise by sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10); and (3) a two-level increase for abusing a position of private trust pursuant to U.S.S.G. § 3B1.3. The Defendant opposes all three of these enhancements. For the following reasons, the Court finds that only the last enhancement applies, setting the final Guideline level at nine.

1. **Enhancement for the Amount of Loss**

"Loss" under the Sentencing Guidelines is the greater of the actual loss caused by the defendant's illegal actions or the amount of loss the defendant intended to cause. U.S.S.G. § 2B1.1, appx. n.8; *U.S. v. Feldman*, 338 F.3d 212 (3d Cir. 2003). There has been no evidence presented as to Yan Zhu's intent to cause a loss. Rather, the dispute between the parties is over the amount of actual loss suffered by enfoTech. The parties both base their estimates of loss on development costs.

The prosecution argues for a fourteen-level enhancement based on the loss figure in Zhu's Pre-Sentence Report ("PSR"), which in turn is based on an estimate made by Tony Jeng of the costs of developing eWastePro. Gov't Sentencing Memo 6; PSR ¶¶ 35, 41. The Government states that "[t]his figure finds ample support in the record," citing Jeng's testimony, and three cost estimates prepared by Jeng: one prepared in November 2007 in connection with the Shaanxi Province contract, one prepared for trial, and one prepared for the probation office before sentencing. Gov't Sentencing Memo 6. This evidence all indicates development costs of approximately $1,000,000. The Government further argues that the payment made by the

6

Shaanxi Province to enfoTech should not be credited against the loss, because "the guidelines recognize that intellectual property has value beyond sales." *Id* at 7.

The defense asserts that Zhu's crime caused no loss to enfoTech. First, it argues that the prosecution's estimate of development costs improperly includes what it would have cost to produce successful software, rather than what enfoTech spent on the incomplete product that was actually developed. It also contends that Zhu's conviction only covers a subset of that incomplete product. Def. Reply Br. 8-9 (prosecution's estimate includes work done on the "trade secret 'source code' which Zhu was acquitted of stealing."); Sentencing Tr. 36-37, 44 (Jan. 5, 2012). The defense prepared its own estimate based on enfoTech's internal pre-contract cost estimates, expert evaluations of the portions of the software that were completed, and the hourly wages of enfoTech employees. The Defendant's sentencing memorandum contends that this estimate is conservatively based on the total development costs of the modules that, according to enfoTech, were completed. *Id.* at 5-6. Based on this data, the defense asserts that the total development costs for eWastepro were at most $107,271. Def. Sentencing Memo 4-8. Finally, the defense argues that the $384,615 payment received through the Shaangxi Province contract should be credited against these costs, resulting in an estimated net profit to enfoTech. *Id.* at 7.

The Government has failed to satisfy the Court by a preponderance of the evidence that enfoTech suffered any loss in this case. Its estimate of development cost is based entirely upon various estimates prepared by Tony Jeng, whom the Court does not find a credible witness for this purpose. Two of the estimates cited were created in preparation for trial or sentencing, and one was created prospectively for sales purposes long before the project was abandoned. None

7

of them are based on specifically enumerated actual expenditures, and none are tailored to Zhu's actual conviction. Although the Government contends that the Defendant's estimate does not include certain specific costs, it does not place a value on those allegedly missing costs. Gov't Sentencing Memo 6-7. Rather, it relies entirely on Jeng's assertions, which are unsupported by more objective evidence and improperly include the development cost of the completed software. There is no doubt that the software was never completed. The Court finds the Defendant's tailored estimate more convincing.

The Court also must credit the payment received by enfoTech against those development costs. Third Circuit courts have held under certain circumstances that actual loss is the net loss to the victim; that is, the total amount of the property fraudulently taken by the defendant less the value of any property or services received in exchange by the victim or recovered by the victim. The mitigation need not come directly from the defendant in order to be credited against the victim's loss. *United States v Kopp*, 951 F2d 521 (3d Cir. 1991) (where defendant obtained a fraudulent loan, actual loss estimated at the time of sentencing was the appropriate measure, not potential loss as measured at the time of the crime); *U.S. v. Matusiewicz*, 402 Fed. Appx. 723 (3d Cir. 2010) (balance owed on mortgage after foreclosure sale was amount of bank's loss as result of bank fraud). *See also United States v. Michalek*, 819 F Supp 250 (W.D.N.Y. 1993); *United States v Demer*, 794 F. Supp 539 (M.D. Pa. 1992).[2] The court should not reduce the loss where

---

[2] The Sentencing Guideline commentary directs courts to reduce the loss by:

> The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.

18 U.S.C.S. § 2B1.1 n.3(E). The government argued at the January 5 sentencing proceeding that this note requires any credit against loss to have come directly from the defendant or his co-conspirators. Sentencing Tr. 35 (Jan. 5, 2012). However, the case law cited here provides for a reduction of loss in certain situations where the defendant

8

the defendant only makes restitution after being caught, *e.g.*, *U.S. v. Dullum*, 560 F.3d 133 (3d Cir. 2009), but this rule is clearly inapplicable to the Defendant.

Whether actual or intended, a victim's loss does not necessarily equal the full value of money or property that was obtained by a defendant. *See*, *e.g.*, *United States v. Tupone*, 442 F.3d 145 (3d Cir. 2006) (loss calculation for workers' compensation fraud is the difference between the amount of benefits actually obtained by defendant, and the amount the government intended the defendant to receive had defendant's forms been accurate). Thus, the loss calculation must take into account certain payments or services that were actually provided to the victim. *U.S. v. Hayes*, 242 F.3d 114 (3d Cir. 2001) (district court had to determine whether any of defendant's services had value to her clients or the agencies, rather than using total salary paid to defendant in all her fraudulently obtained employment as amount of loss, given that she provided actual services in exchange for her salary).

Here, the Defendant could not have caused or intended to cause a loss that had already been paid for. Both parties agree that development costs serve as the measure of loss. These costs had already been recouped by enfoTech pursuant to the same contract that required the Company to develop the product. In other words, the payment serves as a factor in calculating enfoTech's net development costs, not merely as a "credit" against those costs. Although neither party has argued for a loss calculation based on Zhu's intent, it would not change the result. The Defendant knew before his fraudulent scheme began that enfoTech had already received a partial payment for the materials he illegally conveyed outside of the Company.

---

did not pay the victim himself. Further, as explained in greater detail below, the payment in this case is not considered a "credit" so much as a factor in calculating enfoTech's development costs in the first instance.

9

The prosecution's argument in its sentencing memorandum that this payment should not be included in the loss estimate is entirely based on the value of eWastePro as a trade secret. Gov't Sentencing Memo 6-7. However, as the defense correctly notes, Zhu was acquitted of theft of trade secrets, and rather convicted of "defrauding enfoTech of 'proprietary and confidential' business documents." Def. Reply Br. 8. The prosecution did not prove at trial, nor has it satisfied the Court by a preponderance of the evidence for purposes of sentencing, that the materials taken by Zhu had any value beyond the Shaanxi Province contract for which they were developed. The loss in this case has been calculated by both parties based on development costs, and not on speculative consequential damages which the Government has properly excluded. The Shaanxi Province made a partial payment to enfoTech expressly for the development of eWastepro, and this payment more than offset the cost of the product development that was actually undertaken.

For the foregoing reasons, the Government has failed to satisfy the Court by a preponderance of the evidence that enfoTech suffered any financial loss from the Defendant's fraud. The prosecution has not produced a credible estimate of its own, and it has failed to rebut the Defendant's evidence and arguments supporting an estimated loss of zero. Therefore, the Court finds that no sentencing enhancement for the amount of loss applies.

### 2. Enhancement for a Crime Substantially Committed from Outside the United States

The prosecution argues that a two-level enhancement applies because a "substantial part of the fraud was committed from outside the United States." U.S.S.G. § 2B1.1(b)(10)(B). The parties dispute whether or not this enhancement is a subset of the "sophisticated means" enhancement, and thus also dispute whether or not the Defendant perpetrated the fraud using

sophisticated means. Again, the prosecution bears the burden to prove that this enhancement is triggered by a preponderance of the evidence. The Court finds that the fraud was committed neither substantially from outside the United States nor by sophisticated means.

The Government has not convinced the Court that a substantial part of Zhu's scheme was "committed from outside the United States." There are few cases applying this sentence enhancement, so the Government relies on plain meaning rather than analogous case law. It is true that the scheme need not have originated abroad to fall under this Guideline enhancement. *United States v. Singh*, 291 F.3d 756, 761 (11th Cir. 2002). However, all actions constituting the fraud in this case—gathering and conveying the proprietary business information—took place within the United States. The Defendant was acquitted of the conspiracy charge, and thus is not liable for the actions of any alleged co-schemers in China. The crime was committed when Zhu conveyed the information outside of enfoTech, and he is not criminally liable for what was done in China. Thus, the Government has not proven more than that the object of the scheme was conveyed from the United States to China. This is not enough to show that the scheme was substantially committed from China.

It is unclear if the prosecution has formally argued for a sophisticated means enhancement separate from the argument that it was committed from outside the United States. This enhancement does not appear in the PSR, and the Government's contention that it should apply appears for the first time in its response to the Defendant's argument that the other enhancement is a subset of sophisticated means. Gov't Sentencing Memo 8-9. Out of an abundance of caution, the Court will rule on this issue.

The Government has pointed to no facts other than the use of email and other forms of online communication, which are not in themselves enough to trigger this enhancement. The fact that the Defendant may have discussed the fraudulently conveyed materials with its recipients over a period of time does not change this analysis. The Government also urges the Court to consider Zhu's "considerable efforts to hide his tracks." *Id.* at 9. However, merely attempting to avoid detection is not automatically sophisticated; it does not require much sophistication to use personal email during non-working hours while defrauding an employer. Whatever the Defendant's personal level of sophistication, he did not make any elaborate maneuvers in committing this fraud.

### 3. Enhancement for Abusing a Position of Private Trust

The Third Circuit has established a two-stage analysis for the abuse-of-trust enhancement under U.S.S.G. § 3B1.3. "First, the court must determine 'whether the defendant was placed in a position of trust,' and second, if he was, 'whether he abused that position in a way that significantly facilitated his crime.'" *United States v. Sherman*, 160 F.3d 976, 969 (3d Cir. 1998) (quoting *United States v. Craddock*, 993 F.2d 338, 340 (3d Cir. 1993)). *See* U.S.S.G. § 3B1.3, appx. n.1. The three factors a Court must consider during the first stage are "(1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in [the] defendant vis-à-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of [the defendant]." *United States v. Pardo*, 25 F.3d 1187, 1192 (3d Cir. 1994).

The Government has shown by a preponderance of the evidence that this enhancement applies. The Defendant was the project manager for eWastepro, significantly differentiating him

12

from an ordinary employee for purposes of the first prong of the test. The title itself connotes a high degree of authority within enfoTech, particularly over the eWastepro materials. The Defendant points to evidence showing that his access to codes was "limited and controlled," and that he worked under Tony Jeng. Def. Sentencing Memo 11. However, these facts merely establish that there were others within enfoTech who held higher positions. They do not make the Defendant the same as any other employee. His supervisory role in the eWastepro project gave him access to materials that were not widely available even within the Company.

The Defendant has most succeeded in calling into question the third *Pardo* factor, reliance on his integrity, by pointing out that Jeng increased supervision of his actions before he even sent any materials outside the Company. *Id.* This would seem to distinguish this case from the Guideline comment that "ordinarily" persons in managerial positions "are subject to significantly less supervision" than other employees, U.S.S.G. § 3B1.3, appx. n.1. However, enfoTech relied on Zhu's integrity when it made him project manager of eWastepro. Even taking into account the *ad hoc* supervision that was eventually imposed, enfoTech gave him the authority to access the object of the fraud when it trusted him with a supervisory role in the first place.

Having established that the Defendant held a position of trust, the Government must also show that he abused this position in a way that facilitated his crime. *Sherman*, 160 F.3d at 969. The facts outlined above satisfying the first prong of the abuse of trust analysis also serve to satisfy the second. Zhu's crime could not have occurred but for the position of trust he enjoyed within enfoTech, particularly with regard to the eWastepro project. He used the authority specific to his position as project manager of eWastepro to obtain the proprietary materials, and

to fraudulently convey them outside of the Company. The Court finds that this two-level enhancement applies, and therefore the final Guideline level is nine, resulting in an advisory Guideline range of four to ten months.[3]

**B. Departures from the Guideline Range Under 3553(a) Factors.**

Having considered and ruled upon the parties' arguments with regard to the appropriate Guideline level, the Court must now independently review the 3553(a) factors. The Court may exercise its discretion to vary from the Guideline sentence based on the purposes of sentencing outlined in that section. Under 18 U.S.C. § 3553(a), the Court must consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for--
>     (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;
> (5) any pertinent policy statement . . . [issued by the Sentencing Commission];
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Considering these factors, the Court finds that a custodial sentence is inappropriate for this Defendant. First, the Defendant's characteristics and conduct indicate that he is a productive and valued member of society in little danger of repeating his mistakes. He has no prior criminal

---

[3] The parties agree that the Defendant is in Criminal History Category I.

history. It has been amply demonstrated to the Court that Zhu has earned the trust and support of many family and friends, most notably an employer. Not only was he able to procure new employment after leaving enfoTech, but his employer has come to this Court in a show of support, and has continued to trust him with confidential business information. Zhu has also demonstrated that he was raised in a supportive environment and continues to enjoy stable social and familial relationships, including an engagement to be married. This Court is in receipt of a large stack of glowing character references from Zhu's current and former co-workers, employers, professors, friends and family members. Many of these letters recount anecdotes demonstrating Zhu's integrity, honesty, and compassion.

Although the Defendant vigorously defended his innocence throughout trial, he has expressed remorse and has otherwise shown the Court that he understands that his actions were illegal and wrong. In addition to Zhu's stable employment and supportive relationships, this assures the Court that a custodial sentence is unnecessary to deter the defendant from committing future crimes.

The circumstances of the crime also support this conclusion. Zhu's youth and inexperience combined with his involvement with the eWastepro project put him in a difficult situation that is unlikely to be repeated. The Defendant has explained to the Court his belief that the Shaanxi Province contract had been unjustifiably abandoned by enfoTech, and that he was under a personal obligation to deliver a product. Moreover, he believed that he and his cousin, the head of Green Innovation, could both be held responsible by the Chinese government and potentially face severe consequences in that country. *See* Def. Sentencing Memo 14-18. The Government argues in its sentencing memorandum that, in convicting him, the jury "rejected"

the Defendant's characterization of events. Gov't Sentencing Memo 12. However, a conviction does not in fact foreclose the Defendant from arguing at sentencing that he was motivated by difficult circumstances. The Court is satisfied that the Defendant was in part so motivated, and this does not detract from its recognition that he made a serious error in judgment. The Court is also satisfied that the Defendant understands the gravity of his offense.

The Court must not impose a sentence that is "greater than necessary" to serve the purposes outlined in Section 3553(a). 18 U.S.C. § 3553(a). For the foregoing reasons, a custodial sentence would be more than what is necessary in this case. The Defendant is not in need of additional deterrence, nor is there any need to send him to jail in order to protect the public from future criminal activity. Thus, the Court finds that a sentence of three years of probation, with no jail time or house arrest, is appropriate. Because the Defendant is not a citizen of the United States, the Court also imposes a special condition requiring him to cooperate with the Bureau of Immigration and Customs Enforcement.

The Defendant's offense carries a final Guideline level of nine, and a level-eight offense would have an advisory Guideline sentence of probation with no jail time. Thus, the Court's sentence represents a minimal variance from the Guidelines, and the interest in preventing "unwarranted" sentencing disparities between similarly situated Defendants has been met.

## III. CONCLUSION

The Court has concluded that the final Guideline level applicable to Defendant Yan Zhu's offense is nine. The Defendant is in Criminal History Category I. This results in an advisory Guideline range of four to ten months. Exercising its discretion to vary from the advisory Guideline based on the factors in 18 U.S.C. § 3553(a), the Court sentenced the

Defendant on January 5, 2012 to three years of probation with the special condition that he must cooperate with the Bureau of Immigration and Customs enforcement. This Opinion shall be attached to the Judgment filed on January 5, 2012.

/s/ Joel A. Pisano
JOEL A. PISANO
United States District Judge

Dated: February 2, 2012